IN THE
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

ERIC ALVARADO,
     Plaintiff,

v.                            Case No. 1:14-cv-01090-JES-JEH

CAROLYN W. COLVIN,
Commissioner of Social Security,
     Defendant.

## Report and Recommendation

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 12) and the Defendant's Motion for Summary Affirmance (Doc. 16).[1] The Plaintiff appeals from the denial of his application for continuing Social Security Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 USC § 405(g), and from the denial of his application for continuing Supplemental Security Income (SSI) under Title XVI of the Social Security Act, 42 USC § 1383(c)(3). This matter has been referred for a Report and Recommendation. Text Orders entered October 27, 2014 and February 4, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Plaintiff's Motion for Summary Judgment be DENIED and the Defendant's Motion for Summary Affirmance be GRANTED.[2]

## I

In September 1984, Alvarado protectively applied for child's insurance benefits and SSI, alleging disability beginning the date he was born, September

---

[1] Alvarado also submitted a Reply Brief (Doc. 18) which the Court has considered.
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 10) on the docket.

14, 1967. He was found disabled for purposes of SSI as of September 1, 1984. In February 1993, Alvarado was found disabled for purposes of child's insurance benefits and SSI. In September 1999, Alvarado's disability was determined to continue. In August 2004, Alvarado received a Notice of Disability Cessation in which he was informed that the Social Security Administration determined that he was no longer disabled as of July 2004, and so he would no longer receive disability benefits. After Alvarado requested a hearing before an Administrative Law Judge (ALJ), a hearing took place before ALJ Barbara J. Welsch on March 11, 2008. At that hearing, Alvarado, who was represented by an attorney, testified as well as a Vocational Expert (VE) (Dennis Gustafson) and two lay witnesses (Jean Alvarado and Melody Justus). The ALJ issued a decision in June 2008 finding that Alvarado's disability ended on July 31, 2004. The Appeals Council denied Alvarado's request for review, and so he filed suit in federal court on May 11, 2010. The parties agreed to remand the case back to the Commissioner for further proceedings on April 25, 2011. The Stipulation to Remand provided:

> On remand, the Administrative Law Judge will further evaluate whether the Plaintiff's disability continues. The ALJ will compare the pre-comparison point date (CPD)[3] evidence with the post-CPD evidence, as required by 20 C.F.R. § 404.1594(c)(1). In addition, as instructed by 20 C.F.R. § 404.1594(d)(4)(iv), the ALJ will not apply any of the exceptions to the medical improvement standard found in 20 C.F.R. § 404.1594(d)(1)-(4) unless the conditions for reopening, set forth in 20 C.F.R. § 404.988, are met.

(AR 682). The Appeals Council thereafter vacated the June 2008 Decision and remanded the case to ALJ Welsch. On July 10, 2012, another hearing was held before ALJ Welsch, during which time Alvarado, who was represented by an attorney, testified, a VE (James Ragains) testified, and one lay witness (Melody

---

[3] The CPD is the date of the last favorable decision by the Social Security Administration. Here, that date was September 24, 1999. (AR 635).

Justus) testified. On August 3, 2012, the ALJ determined that Alvarado's disability ended on July 31, 2004. Alvarado's request for review by the Appeals Council was denied on February 10, 2014, making the ALJ's decision the final decision of the Commissioner. Alvarado filed the instant civil action seeking review of the ALJ's Decision on March 13, 2014.

## II

Alvarado, now 47 years old, was first determined disabled in 1993 by the Social Security Administration in order to obtain benefits, though it determined that his disability began as of September 14, 1967 (Alvarado's date of birth). He received disability benefits on the basis of a learning disorder and personality disorder.

At the March 11, 2008 hearing, Alvarado (represented by an attorney) testified that he lived with his sister, cousin, and cousin's six year old child. He testified that he attended college at three different schools (Parkland College, Landmark College, National Louis University), one being in Vermont which was a special college for people who had learning disabilities. He testified that he ultimately received his Associate's Degree and that he was four or five classes away from receiving his Bachelor's Degree. While he was attending school at Landmark College in Vermont, Alvarado testified that he took a plane home to visit his mother and brother back in Illinois.

While in school and college, Alvarado testified to all the accommodations he received, including tutors and extra time for tests, among other accommodations. He testified to some of the issues he had at school including being late for class.

In terms of work, Alvarado testified that the last time he worked was after high school or in between college cutting grass through a program. He also testified that he watched his mom's employee's (Justus) children at the flower

shop his mom owned while Justus was present for about one week. He said there was never a time that it was just him and the children.

Alvarado further testified that his routine was that he went to his mother's (Jean) flower shop with her and his sister (Adela), and he would wait around until his mother or Justus asked him to do something. Right before his mother's flower shop closed in January 2008, his routine included driving from Normal, Illinois to Leroy, Illinois to pick up his mother and he would then drive them to the shop in Bloomington, Illinois. He stated that he would shovel snow in the winter and take the trash out if he was asked to do so. He testified that his mother or Justus would join him while he made flower deliveries so that they could give him directions, and that he rarely made the deliveries in the van by himself. He testified that one difficulty he had while working at the flower shop was that he would get lost going back to locations he had been before. In the evenings, after the shop closed, Alvarado would watch TV or be on the computer playing games. He rarely sent emails and when he did, they were links to videos or something sent to his brother to see. He testified to enjoying political websites and YouTube.

Alvarado testified that neither his reading nor writing were very good. He also testified that his organizational skills, his learning disabilities, and his dyslexia were problems that would keep him from working. The last job he applied for – an internship with the Boy Scouts – he did not get and was informed it was because he was not qualified.

The ALJ then questioned the VE, Dennis Gustafson. The ALJ asked the VE to assume an individual who was 40 years old with a high school education, no past relevant work, and no exertional limitations. The ALJ further asked the VE to assume that the individual would be limited to jobs which were routine and repetitive, did not require much in the way of reading to perform the jobs, and

that could be demonstrated by someone before asking the individual to perform those jobs. The VE responded with a number of examples of jobs that such a hypothetical person could perform.

Alvarado's attorney then questioned the VE whether the identified jobs would still be available if the hypothetical individual needed twice as much time as a standard employee to perform the work. The VE answered in the negative.

Melody Justus next testified about her relationship with Alvarado, including how long she had known him and her various interactions with him. She testified to what he did at his mother's flower shop and the circumstances surrounding Alvarado watching her children at times. Justus testified that Alvarado had difficulty performing the tasks he was given at the flower shop and that there was always somebody else present when Alvarado watched her children. She testified about evidence in the record of a childcare agreement purportedly signed by Alvarado that was prepared by Justus's ex-boyfriend, Darryl McGinty. Justus explained that Alvarado was never paid to watch her children. Justus further explained that the agreement was drafted while she was going through a divorce and was having problems with McGinty whom she had been paying $100 to babysit. She testified that the receipts for child care were devised to that McGinty would not get in trouble for not paying taxes on the babysitting money he received from her.

Justus also testified about McGinty's harassing behavior towards her, and his threats to her, Alvarado, Alvarado's mother Jean, and Alvarado's sister Adela. She testified that it was at the time he was convicted for his actions towards her that McGinty sent a letter to the Social Security Administration stating that Alvarado was working at the flower shop and getting paid for it. Justus testified that she believed McGinty sent the letter in retaliation.

Jean Alvarado testified that Dr. William N. Hilger's (a consultative examiner) comments in the record – that Alvarado tried to avoid his appointment with Dr. Hilger in 2004 – followed a phone call Dr. Hilger's office had with Alvarado during which time Jean suggested to Alvarado that he reschedule the appointment because of transportation problems.

Jean testified about the time Alvarado spent at the flower shop, stating that he occasionally made deliveries on his own, that it took him longer to make deliveries, that he was not able to answer the phone, and that she took him to work because he needed an activity and to feel good about himself.  Jean also testified that her son did not babysit Justus's children in the sense of being responsible for them.  She also testified to the difficult situation between Justus and McGinty.  She explained that she signed the childcare receipts on behalf of her son and as a favor to Melody.

When asked whether she felt her son was capable of working, Jean responded that he would not be because it took him too long to do anything and that he had a hard time expressing himself with people.  She testified that she did not see an improvement in her son's capabilities.

At the July 10, 2012 hearing, Alvarado (again represented by an attorney), testified to his vision issues, specifically how words moved around and were blurry for him and how natural light worked best for him.  He explained that he did not read very well.

Alvarado again testified to his previous work mowing lawns and how he had problems with that job because he would not remember how different places were supposed to be cut and he would run over things with the mower.

He testified to having just one friend – Justus – and he explained how his mother Jean passed away in 2009.  At the time of the 2012 hearing, Alvarado was

living with his sister Adela, his brother Diego (when not out of town for work), Diego's girlfriend, and the girlfriend's daughter.

He testified that he owned a car, drove about once per day, and would drive to Justus's house. He also testified about his cell phone, and how Justus set it up to say who was calling when it rang and set it up to include speed dials. Alvarado testified about his forgetfulness when grocery shopping, even when he had a list with him. His attorney again elicited information from him that he had trouble getting to places on time because it took him longer to get to his destination than he allowed for and that he would get lost sometimes.

The ALJ next questioned the VE, James Ragains. The ALJ asked the VE to assume an individual who was 44 years old, a graduate of high school in special education with an Associate's Degree obtained through a special education program, and no exertional limitations. The ALJ further asked the VE to assume no past relevant work for that individual, and that the individual would be limited to jobs that did not require complex or detailed job processes, little in the way of change in the job process from day to day, and jobs that did not require interaction with the public. The ALJ further asked the VE to assume for that individual only jobs that could be learned by demonstration rather than jobs that required reading, writing, or math calculations to learn the job or to perform the job. The VE responded with examples of jobs that could be performed by such a hypothetical individual including house cleaner, automobile washer, and kitchen helper.

The ALJ then asked the VE to assume the individual only had vision in one eye so that he did not have depth perception. The VE responded that such a limitation would not preclude the jobs of house cleaner, automobile washer, or kitchen helper. Problems with eye-hand coordination, suggested in a question by Alvarado's attorney, also would not preclude those jobs. The VE explained

that the jobs he cited were ones that according to the Department of Labor's job analysis would not require general mental abilities at an average level. Then Alvarado's attorney questioned the VE about the element of pace and concentration in performing the cited jobs, the VE responded that in his opinion, based upon his experience in vocational rehabilitation, a person would have to be on task 90 percent of the time or not off task for more than 10 percent of the time in terms of affecting persistence and pace. He further opined that it would be hard for someone to sustain employment with the problem of being off task six minutes an hour with only a ten minute break. The VE explained that if a person needed frequent supervision, that would be in the realm of supported employment rather than gainful or competitive employment. The VE also explained that the cited jobs were routine and repetitive, and agreed that the important thing with the job of automobile washer was pace and concentration.

The ALJ next questioned Melody Justus. She testified that since Alvarado's mother Jean died, Alvarado spent most of the day with Justus. She testified that he could not clean her pool by himself and could not even do it really that well with supervision. She testified to a typical day including calling Alvarado to wake him up and go over the schedule for the day and take him on errands with her. Justus testified that he had no friends other than her. She again testified to what Alvarado did at his mother's flower shop, stating that he was not really able to do effective work there. Finally, Justus testified to a recent vacation that included Alvarado to Niagra Falls and how the group would be walking and Alvarado would have stopped to look at something so that the group would lose him.

### III

In the ALJ's 39-page decision, she addressed the medical and non-medical evidence in abundant detail. She addressed both pre-CPD and post-CPD

evidence in the same amount of detail.  Included in the pre-CPD evidence the ALJ discussed were:  medical records from 1980; a vocational evaluation done by Steven H. Putnam, Ph.D. in 1984; a Social Work Reporting Form; Alvarado's school records and psychological evaluations from the 1970s, 1980s, and early 1990s; a Speech Evaluation dated November 1989; Social Security documents regarding Alvarado's previous applications for disability and the findings at those times (including various diagnoses); opinions and determination by state agency consultants; a Psychological Consultative Examination by Valjean M. Cashen, Ed.D.; and the results of IQ testings.

Included in the post-CPD evidence were two Psychological Assessment Reports, dated 2008 and 2012, that were submitted by Dr. Luke Dalfiume who was solicited to do the evaluations by Alvarado's attorneys.  Also part of the post-CPD evidence discussed was a consultative psychological evaluation done by Dr. William N. Hilger on July 9, 2004 on behalf of the Bureau of Disability Determination Services.  The ALJ recited Alvarado's, Justus', and Jean's testimony at both the hearing in 2008 and 2012.  The ALJ also addressed letters submitted to her by Diego, Justus, and Mr. Richard Farr who was the Supervisor of Normal Township and who had Alvarado as a general assistance client since February 2011.  The ALJ also discussed the information contained within documents from the Office of the Inspector General, Office of Investigations Allegation Management Division dated November 2004 and February 2005.  The information contained within those documents pertained to what McGinty alleged about Alvarado's work at Jean's flower show, and pertained to the investigation done as a result of McGinty's allegations.

## IV

Alvarado argues eleven points:  1) that the ALJ erred in accepting the diagnosis of malingering by Dr. Hilger and thus made unwarranted credibility

findings; 2) that the ALJ erred in adopting the findings of Disability Hearing Officer Mike Finley on October 6, 2005 in which Finley stated Alvarado was not disabled; 3) that the ALJ erred in determining that medical improvement occurred as of July 31, 2004; 4) that the ALJ erred in not considering the effect of his Scotopic Sensitivity Syndrome; 5) that the ALJ erred in considering the Office of Inspector General's (OIG) investigation as it was incomplete; 6) that the ALJ erred in stating that Alvarado's work for his mother demonstrated medical improvement; 7) that the ALJ erred in rejecting the opinion of Dr. Dalfiume that Alvarado had exceedingly slow process in speed; 8) that the ALJ made frequent inadequate credibility determinations so that there was only one conclusion here to reverse and remand this case for a finding of disability; 9) that the ALJ erred in stating the hypothetical to the VE; 10) that the ALJ erred in not including in the hypothetical to the VE all of Alvarado's limitations such as how slow he was in completing tasks; and 11) that the ALJ erred in not adopting the conclusion that Alvarado would be able to function in several, albeit structured and selected entry level occupations, under supervision and would experience some difficulty in understanding, remembering, carrying out instructions, sustaining concentration, being persistent, and adapting to the job task.[4]

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence.  See *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000); *Pugh v Bowen*, 870 F2d 1271 (7th Cir 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 USC § 405(g).

---

[4] The Court notes that the organization of Alvarado's arguments leaves something to be desired, given that the Court and Commissioner are tasked with addressing 11 separate alleged errors in no particular order.  Surely, many of those "errors" are related and could have been presented under the same heading, each better articulated to touch upon the crux of the argument.  Accordingly, the Court will address each alleged error in the order in which the Commissioner did so in her Memorandum in Support of Motion for Summary Affirmance.  See (Doc. 17).

Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v Barnhart*, 297 F3d 589, 593 (7th Cir 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v Bowen*, 782 F2d 79, 82 (7th Cir 1986).

Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v Perales*, 402 US 389, 390 (1971); *Henderson v Apfel*, 179 F3d 507, 512 (7th Cir 1999). Furthermore, determinations of credibility made by the ALJ will not be overturned unless the findings are clearly erroneous. *Anderson v Bessemer City*, 470 US 564, 573 (1985); *Imani v Heckler*, 797 F2d 508 (7th Cir 1986), cert denied, 479 US 988 580 (1986).

First, the claimant must be suffering from a medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 USC § 423(d)(1)(A). Second, a person is disabled only if his physical or mental impairment or impairments are of such severity that he is both unable to do his previous work and also cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 USC § 423(d)(2)(A).

In determining whether a claimant who was found disabled continues to be disabled, the ALJ follows an eight-step process for the Title II claim and a seven-step process for the Title XVI claim. 20 CFR §§ 404.1594; 416.994.

In the first step for the Title II claim, the ALJ must determine if the claimant is engaging in substantial gainful activity (SGA); if so, the claimant is no longer disabled. 20 CFR § 404.1594(f)(1). For the Title XVI claim, the performance of SGA is not a factor used to determine if the claimant's disability continues. 20

CFR § 416.994(b)(5).  If the claimant is not engaged in SGA, step two for the Title II claim and step one for the Title XVI claim require the ALJ to determine whether the claimant has an impairment or combination of impairments that meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  If the claimant does, his disability continues.  20 CFR §§ 404.1594(f)(2); 416.994(b)(5)(i).

At step three of the Title II claim and step two of the Title XVI claim, the ALJ must determine whether medical improvement has occurred.  20 CFR §§ 404.1594(f)(3); 416.994(b)(5)(ii).  Medical improvement is any decrease in the medical severity of the claimant's impairment(s) that were present at the time of the most recent favorable medical decision, and medical improvement is established by improvement in symptoms, signs, and/or laboratory findings.  20 CFR §§ 404.1594(b)(1); 416.994(b)(1)(i).  If medical improvement has occurred, the analysis proceeds to the fourth step for the Title II claim and the third step for the Title XVI claim. If not, the analysis proceeds to the fifth step for the Title II claim and the fourth step for the Title XVI claim.

At step four of the Title II claim and step three of the Title XVI claim, the ALJ must determine whether the medical improvement is related to the ability to work.  20 CFR §§ 404.1594(f)(4); 416.994(b)(5)(iii).[5]  If so, the analysis proceeds to step six of the Title II claim and step five of the Title XVI claim.

At step five of the Title II claim and step four of the Title XVI claim, the ALJ must determine if an exception to medical improvement applies.  20 CFR §§ 404.1594(f)(5); 416.994(b)(5)(iv).  There are two groups of exceptions. 20 CFR §§ 404.1594(d), (e); 416.994(b)(3), (b)(4).  If an exception from the first group applies, the analysis proceeds to the next step. If an exception from the second group

_____

[5] Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities.  20 CFR §§ 404.1594(b)(3); 416.994(b)(1)(iii).

applies, the claimant's disability ends. If no exception applies the claimant's disability continues.

Step six of the Title II claim and step five of the Title XVI claim require the ALJ to determine whether all the claimant's current impairments in combination are severe. 20 CFR §§ 404.1594(f)(6); 416.994(b)(5)(v). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step.

At step seven of the Title II claim and step six of the Title XVI claim, the ALJ must assess the claimant's residual functional capacity (RFC) based on the current impairments and determine if he can perform past relevant work. 20 CFR §§ 404.1594(f)(7); 416.994(b)(5)(vi). If the claimant has the capacity to perform past relevant work, his disability has ended. If not, the analysis proceeds to the last step.

At the last step, the ALJ must determine whether other work exists that the claimant can perform, given his RFC and considering his age, education, and past work experience. 20 CFR §§ 404.1594(f)(8); 416.994(b)(5)(vii). If the claimant can perform other work, he no longer is disabled. If the claimant cannot perform other work, his disability continues. At this last step, the claimant still has the burden of proving disability, but a limited burden of going forward with the evidence shifts to the Social Security Administration. To support a finding of disability, the SSA must provide evidence demonstrating that other work exists in significant numbers in the national economy that the claimant can do, given the claimant's RFC, age, education, and work experience.

## A

Though a very brief argument, Alvarado argues that the ALJ erred in not considering the effect of his Scotopic Sensitivity Syndrome, and that the ALJ

otherwise played doctor in not considering the Syndrome and not conducting a critical review of the evidence as required by case law. The Commissioner counters that Alvarado is simply mistaken, and that the ALJ considered all of Alvarado's impairments, including the Syndrome.

The Commissioner is correct. In the ALJ's Decision, she devoted time to discussing an evaluation in 1990 which resulted in an assessment of Scotopic Sensitivity Syndrome[6], and how it did not appear to be considered an established medically determinable severe impairment by the state agency medical consultants or that it had been considered a contributing factor to the prior findings of disability. (AR 635-36). The ALJ did not stop there. She explained how Dr. Dalfiume "simply accepted that the diagnosis was correct without identifying reliable evidence that supported the diagnosis" and how no treating or examining source since 1990 appeared to have independently diagnosed the condition. (AR 636). The ALJ noted that the secondary diagnosis, for purposes of Alvarado's application for benefits in 1992, was alternating esotropia.[7] (AR 636). The ALJ discussed medical consultant Paul M. Caldwell, M.D.'s Individualized Functional Assessment in September 1992 which indicated that Alvarado's vision was correctable to 20/20 and that there was no restriction in activities due to vision problems. (AR 294, 636). Thus, the ALJ considered Alvarado's Scotopic Sensitivity Syndrome, considered the effects of his vision issues, and did not play doctor where she accurately noted that no treating or examining source since 1990 independently diagnosed the Syndrome.

---

[6] The Commissioner explains that the Syndrome is associated with reading problems and can be treated with colored filters. (Doc. 17 at pg 5) n 2.

[7] The Commissioner explains that esotropia is a condition in which both eyes cannot be directed at the same time towards the object that is being viewed. (Doc. 17 at pg. 5) n 3.

**B**

Alvarado also argues that the ALJ "was told to only consider the date of 1999," and that she went outside her authority in reviewing evidence prior to the pre-CPD as specified in the remand order. The Commissioner counters that the ALJ properly followed the Appeals Council's remand order.

The clear direction the ALJ was given both in the Order of remand in federal court and the Appeals Council's August 3, 2011 Order Remanding Case to Administrative Law Judge was that she was to consider *pre*-CPD with *post*-CPD evidence. (AR 681-83, 690-91). The ALJ was told to consider 1999 insofar as that was the CPD, but she was not told to consider *only* that date. Alvarado also takes issue with the ALJ noting that "arguably this case could fall under one of the exceptions to medical improvement as substantial evidence suggests the prior disability decisions were in error." (AR 645). However, there is no issue where the ALJ clearly stated that the case was not being decided based on an exception to medical improvement, but rather a discussion of all the evidence was provided for purposes of thoroughness and for purposes of supporting her finding about the credibility of Alvarado's and others' statements. (AR 645).

**C**

Alvarado makes a number of independent arguments (issues 1, 2, 5, 6, 7, 8, 11 listed above) that the Commissioner rightly responded to in one counter-argument; the Commissioner argues that the ALJ properly evaluated the relevant evidence.[8]

**1**

First, Alvarado argues that the ALJ erred in adopting Hearing Officer Finley's October 2005 findings, and argues that Finley actually found him partly

---

[8] The Court will therefore address the remainder of Alvarado's arguments in the order in which the Commissioner addresses them.

disabled as he had impairment-related restrictions on his ability to work. The Commissioner correctly and succinctly counters that there is no indication in the ALJ's Decision that she relied upon Finley's findings. Indeed, Alvarado does not cite to any portion of the ALJ's Decision where she purportedly adopted Finley's findings. Perhaps Alvarado intended to make a different point in arguing that the ALJ erred in adopting Finley's findings, but that different point was not stated and the Commissioner can only respond to and the Court can only analyze those arguments that are actually before the Court and applicable given the particular case.

2

Second, Alvarado argues that the ALJ erred in considering the OIG information where, essentially, it gave an incomplete picture of the events following the OIG's investigation. Alvarado argues that the OIG did not put a conclusion in the file so there is no evidence that Alvarado or Jean had any legal problems as a result of that investigation. He also argues that there is no mention of the outcome of Justus's divorce, that the only confirmed legal result in the record is that McGinty was charged with harassing Justus, and that Justus's testimony provided detailed information as to Alvarado's role at the flower shop, his role looking after her children, and her situation with McGinty at the time of the OIG's involvement. In refuting that the ALJ erroneously considered the OIG evidence, the Commissioner argues that the OIG evidence was part of the record, so the ALJ reasonably considered that evidence and Alvarado fails to cite authority for his contention that the OIG evidence should not have been considered where it was incomplete and did not result in any legal problems for Alvarado.

The additional information that Alvarado identifies to support his argument that the ALJ should not have considered the OIG evidence was

considered by the ALJ.  In her Decision, the ALJ discussed the allegations made to the OIG, how the allegations were substantiated by a Social Security employee from the Bloomington, Illinois office, and Justus's testimony about Alvarado's role at the flower shop and her relationship with McGinty.  In making a credibility determination, Social Security Ruling 96-7p states that an ALJ must consider the record as a whole, including objective medical evidence, the claimant's statements about symptoms, statements or other information from treating or examining physicians and other people about the conditions and how they affect the claimant, and any other relevant evidence.  1996 WL 374186. Furthermore, an ALJ is tasked with considering all relevant evidence, and may not select and discuss only that evidence which favors her ultimate conclusion. *Binion on Behalf of Binion v Chater*, 108 F3d 780, 788 (7th Cir 1997).  The ALJ did what was required of her here where the evidence she used to make credibility determinations was thoroughly discussed, including OIG evidence and the testimony that cut against the "reliability" and completeness of the OIG evidence.

### 3

Next, Alvarado argues that the ALJ erred in her evaluation of Dr. Hilger's and Dr. Dalfiume's opinions.  In regard to Dr. Hilger's opinion, Alvarado essentially argues that too much emphasis was placed upon Dr. Hilger's diagnosis of "malingering with suboptimal and disingenuous effort."  (AR 443, 648).  As a result, Alvarado argues that the ALJ's use of that diagnosis to deny the credibility of Alvarado's family and friend was wrong.  Specifically, Alvarado argues that the ALJ's emphasis upon Dr. Hilger's diagnosis was erroneous because there are tests for malingering that Dr. Higler did not perform, Alvarado's early records showed he simply had deficits in many respects including learning strategies, a 1993 agency report supported that his

medical condition had been present since birth, another doctor considered Alvarado's slowness in his performance as early as 1984, yet another doctor noted his need for structured and selected entry level occupations under supervision, and no other tests suggested malingering. The Commissioner counters that the ALJ thoroughly considered Alvarado's July 2004 consultative examination with Dr. Hilger, and ultimately, it was reasonable for the ALJ to consider Dr. Hilger's diagnosis of malingering in evaluating Alvarado's credibility because it was based upon Dr. Hilger's observations and expertise.

In regard to Dr. Dalfiume's opinion, Alvarado argues that the ALJ refused to consider any contradictions (i.e. Dr. Dalfiume's 2008 and 2012 Psychological Assessment Reports) to her assumptions. Alvarado ultimately takes issue with each of the reasons the ALJ stated for not giving Dr. Dalfiume's conclusions controlling weight. The Commissioner argues that a review of the ALJ's Decision makes clear that she was aware of and considered the appropriate factors in evaluating Dr. Dalfiume's opinions.

When an ALJ considers a medical opinion from a non-treating source, the ALJ must consider how well the non-treating source supported and explained his opinion, whether his opinion is consistent with the record, whether the non-treating source is a specialist as to the medical issues he reviewed, and other relevant factors of which the ALJ is aware. 20 CFR §§ 404.1527(c)(2)-(6); 416.927(c)(2)-(6).

Here, in giving more weight to Dr. Hilger's consultative examination, the ALJ stated:

> These conclusions, along with vocational testimony, are given more weight that the subjective mostly self-serving statements of the claimant's brother, mother and Ms. Justus. The conclusions are given more weight because they are most consistent with the reliable evidence as a whole, i.e., evidence of what the claimant has actually

done versus what his mother, brother, and Ms. Justus say he can't
do.

(AR 660).  In her consideration of Dr. Dalfiume's Reports, the ALJ included a
detailed discussion of the tests Dr. Dalfiume conducted with Alvarado in 2008
and 2012, the results of those tests, the information that Dr. Dalfiume had at both
the 2008 and 2012 examinations (which included other evidence of record that
the ALJ discussed earlier in her Decision), the circumstances that led to Dr.
Dalfiume examining Alvarado, and the discrepancies between his conclusions
and the claimant's and others' testimony and subjective statements.  The ALJ
stated, "There are various reasons to be skeptical of some of the conclusions
reached in [Dr. Dalfiume's 2008] assessment."  (AR 662).  The ALJ went on to
discuss the various reasons, among which was that:

> [T]he claimant's statements and the claimant's mother's statements
> are considered subjective and self-serving and conclusions by Dr.
> Dalfiume based on those statements are considered but not given
> controlling weight.

(AR 662).  The ALJ also stated:

> Dr. Dalfiume's conclusions are more consistent with the claimant's
> actual functioning as discussed above . . . Dr. Dalfiume's curriculum
> vitae . . . fails to establish that he has any particular expertise in
> vocational issues or job placement.  Accordingly, more weight is
> given to the vocational expert's testimony regarding jobs that Dr.
> Dalfiume's conclusions regarding what jobs would be a "good fit"
> for an individual with particular limitations.

(AR 663).  In finding that Dr. Dalfiume's 2012 Report was entitled to little weight,
the ALJ again provided various reasons including that Dr. Dalfiume was
provided only selected documents designed to advance the desired conclusions
of Alvarado and his attorney, that he relied heavily on subjective and self-serving
statements of Alvarado and Justus, that he had no treatment relationship with

Alvarado, and both of his multi-day evaluations were procured in order to bolster the claimant's attempts to regain social security disability benefits.  (AR 665-66).  The ALJ concluded by stating:

> The conclusions set forth by Dr. Dalfiume do not provide a reliable basis for concluding that the claimant is incapable of engaging in any type of competitive work activity.  As noted above, more weight is given to the claimant's actual demonstrated abilities . . . .

(AR 666).

The ALJ's discussions of Dr. Hilger's and Dr. Dalfiume's opinions, considered together, make it possible for the Court to clearly trace the path of the ALJ's reasoning in reaching her conclusions about what weight to give each of those non-treating sources' opinions.  See *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993) (requiring the ALJ to sufficiently articulate his assessment of the evidence to assure the court that the ALJ considered the important evidence and to enable the court to trace the path of the ALJ's reasoning).  The ALJ demonstrated that she considered the required factors in determining what weight to give the non-treating sources' opinions.

Some of the errors that Alvarado assigns to the ALJ – improperly rejecting Dr. Dalfiume's opinion because he was a one-time consultant retained by the claimant, making accusations that Alvarado's attorney only provided selected documents designed to advance the desired conclusions – have some merit.  See *Hickel v Commisioner of Social Security*, 539 F App'x 980, 987 (11th Cir 2013) ("The fact that Dr. Eastridge was a one-time consultative examiner retained by the claimant rather than the Commissioner is not, standing alone, a valid basis for rejecting his medical opinion"); *Punzio v Astrue*, 630 F3d 704, 712 (7th Cir 2011) ("[T]he fact that relevant evidence has been solicited by the claimant or her representative is not a sufficient justification to belittle or ignore that evidence . . .

Quite the contrary, in fact. The claimant bears the burden of submitting medical evidence establishing her impairments and her residual functional capacity"). However, in *Punzio*, unlike in this case, the claimant's *treating* psychiatrist was solicited to weigh in on the claimant's condition. *Punzio*, 630 F3d at 712. It is a notable distinction that in this case, Dr. Dalfiume was merely a *consultative* source that had examined Alvarado on just two separate occasions. Additionally, here the ALJ did not disregard Dr. Dalfiume's opinions on the sole basis that he was one-time consultative examiner retained by the claimant rather than the Commissioner. As discussed above, the ALJ articulated various reasons for according Dr. Dalfiume's opinions little weight.

**4**

Alvarado's next argument, one he identifies as his "Argument in Conclusion," is that the ALJ erred in not adopting consulting psychologist Dr. Valjean Cashen's 1999 opinion. Alvarado argues that Dr. Cashen's opinion, supported by his own testing, was erroneously rejected for Dr. Hilger's whose report was totally subjective. Thus, Alvarado says that the ALJ erred in not considering the restrictions identified by Dr. Cashen in the hypothetical presented to the VE. In response, the Commissioner argues that Alvarado does not appreciate that the ALJ decided that his disability ended on July 31, 2004, and so Dr. Cashen's opinion from 1999 is not relevant to that determination.

The ALJ was required to consider pre-CPD evidence and post-CPD evidence. Dr. Cashen's August 25, 1999 Psychological Consultative Examination was part of that pre-CPD evidence. The ALJ correctly discussed his Examination in her Decision. Alvarado's argument simply amounts to the argument that the Court should re-weigh the evidence and decide that Dr. Cashen's opinion was entitled to such significant weight that the limitations he identified for Alvarado should have been included as part of the restrictions presented to the VE in the

hypothetical. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. *Clifford v Apfel*, 227 F3d 863, 869 (7th Cir 2000).

**5**

Alvarado also argues that the ALJ erred in stating that his work for his mother demonstrated medical improvement. He contends that the ALJ did circular thinking in this case. Alvarado states, "This discrediting of testimony due to a desire to get on social security and is [sic] unsupported so as to warrant a reassessment of all Witnesses' credibility on remand." (Doc. 13 at pg. 13).[9] The Commissioner refutes that the ALJ improperly discredited Alvarado's brother's, mother's, and friend Justus's testimony on their desire that he receive Social Security benefits because the ALJ explained that the statements from those individuals were not consistent with the record as a whole.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). As discussed above, SSR 96–7p instructs that when determining the credibility of the individual's statements, the adjudicator must consider the entire case record, and that a credibility determination "must contain specific reasons for a credibility finding[,]" supported by the evidence in the record. *Steele v Barnhart*, 290 F3d 936, 942 (7th Cir 2002). "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F3d at 942.

---

[9] Later in his Memorandum in Support of Motion for Summary Judgment, Alvarado argues that "[t]he ALJ made frequent inadequate credibility determinations so that there is only one conclusion and that is the case should be reversed and remanded for a finding of disability." (Doc. 13 at pg. 16). The argument was made so inarticulately, that the Court will not address it.

Here, the ALJ provided an adequate explanation for why she found Justus's, Jean's, and Diego's testimony unreliable. The ALJ found Justus's and Jean's statements unreliable based, in part, upon evidence in the record that those two women were willing to falsify records for Justus's personal gain. The ALJ also determined Justus's statements unreliable on the express basis that there was no reliable evidence corroborating her statements. In other words, as the Commissioner argues, the ALJ rejected Justus's and Jean's statements because they were not consistent with the record as a whole. In finding Diego well meaning, but that he did not provide any reliable vocational information regarding what his brother could do, the ALJ explained, "[M]ore weight is given to the less subjective/self-serving evidence in the file and vocational testimony from a vocational expert." (AR 657). The ALJ's observations of the record evidence as it pertained to credibility were both reasonable and supported.

**6**

The last two errors to be addressed that Alvarado raises are that the ALJ erred in stating the hypothetical to the VE and the ALJ erred in not including in the hypothetical to the VE all of Alvarado's limitations, including how slow he was in completing tasks. In particular, Alvarado points out that when the VE was questioned about further limitations posed by Alvarado's attorney (which he says were supported by the medical record), the VE responded affirmatively. Thus, Alvarado argues that considering the *correct* hypothetical, he was disabled. The Commissioner identifies Alvarado's argument as one that actually rests with the ALJ's evaluation of the medical evidence and decision to discredit Alvarado's allegations regarding the severity and limiting effects of his impairments. The Commissioner refutes that the ALJ made an error in this regard, and argues that the ALJ properly evaluated the medical evidence, including the medical source opinion evidence. The Commissioner further argues that the ALJ included

additional work-related limitations to account for Alvarado's impairments to the extent they were supported by the relevant evidence in the record.

The parties agree that an ALJ must question a VE regarding every impairment set forth in the claimant's record to the extent that the impairment is supported by the medical evidence. See *Jens v Barnhart*, 347 F3d 209, 213 (7th Cir 2003); *Stewart v Astrue*, 561 F3d 679, 684 (7th Cir 2009). However, an ALJ is "required only to incorporate into [her] hypotheticals those impairments and limitations that [s]he accept[ed] as credible." *Simila v Astrue*, 573 F3d 503, 521 (7th Cir 2009).

Though Alvarado may disagree with the weighing of evidence and the credibility determinations the ALJ made in this case, the ALJ's findings in those two regards are supported by substantial evidence as detailed above. Reasonable minds could accept that there was more than enough relevant evidence the ALJ in fact relied upon to support her findings. The ALJ posed hypotheticals to the ALJ that reflected the extent to which the ALJ find Alvarado's limitations credible and supported by medical evidence. See *id* (explaining that "the ALJ made clear that she did not find [the claimant's] symptoms to be as acute as either [the evaluating doctor's] letter suggested or [the claimant] testified"). Therefore, the ALJ's hypotheticals presented to the VE, which incorporated only those limitations the ALJ determined to be credible, were not erroneous and remand is not warranted on the basis of a flawed hypothetical.

## V

For the reasons set forth above, the Court recommends that the Commissioner's Motion for Summary Affirmance (Doc. 16) be GRANTED and the Plaintiff's Motion for Summary Judgment (Doc. 12) be DENIED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

Entered on April 29, 2015.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE